**AMERICAN BIOSCIENCE, INC. Plaintiff,**

v.

**Tommy G. THOMPSON, et al., Defendants.**

**No. CIV.A. 00–2247 CKK.**

United States District Court, District of Columbia.

April 19, 2001.

---

Arthur YaShih Tsien, Olsson, Frank & Weeda, P.C., Washington, DC, Joseph F. Coyne, Sheppard, Mullin, Richter & Hampton, LLP, Los Angeles, CA, for Plaintiff.

Drake Stephen Cutini, U.S. Department of Justice, Office of Consumer Litigation, John D. Kiser, Richard Melvyn Cooper, Williams & Connolly, Washington, DC, for Defendants.

## MEMORANDUM OPINION

KOLLAR–KOTELLY, District Judge.

Before the Court is the Renewed Motion of Plaintiff American BioScience, Inc. ("ABI") for a Temporary Restraining Order or Preliminary Injunction. ABI, which holds a patent related to the anti-cancer drug paclitaxel,[1] asks the Court to (1) order the Food and Drug Administration ("FDA") to rescind its approval for a generic version of paclitaxel produced by Intervenor Baker Norton Pharmaceuticals ("BNP")[2] and (2) order BNP to recall its product from the market. The United States Court of Appeals for the District of Columbia Circuit vacated this Court's denial of ABI's original motion on the ground

that no administrative record had been filed.

In accordance with rulings issued during an April 11, 2001 conference call, the Court addresses the proposed temporary restraining order and preliminary injunction simultaneously. Upon consideration of ABI's renewed motion, the oppositions filed by the FDA and BNP, ABI's reply, the administrative record, and the applicable law, the Court concludes that neither a temporary restraining order nor a preliminary injunction is warranted.

## I.  BACKGROUND [3]

### A.  Statutory Framework

This case revolves around the interpretation of the statutory framework that governs the marketing of generic drugs. A generic drug contains the same active ingredients, but not necessarily the same inactive ingredients, as a brand-name prescription drug. *United States v. Generix Drug Corp.*, 460 U.S. 453, 455, 103 S.Ct. 1298, 75 L.Ed.2d 198 (1983). Ready availability of generic drugs is believed to benefit consumers by increasing competition and reducing prices. All drugs, including generic drugs, must receive FDA approval before they can be marketed. Typically, a drug manufacturer wishing to market a new drug (so-called "pioneer manufacturers") must complete a New Drug Application ("NDA") in order to obtain FDA approval. The applicant must submit "data from studies showing the drug's safety and effectiveness," which renders the NDA process both time-consuming and expen-

---

1.  Intervenor Bristol–Myers Squibb Company ("Bristol–Myers") currently sells the drug under the brand name Taxol.

2.  BNP intervened together with Zenith Goldline Pharmaceuticals, Inc. The Court refers to them collectively as "BNP."

3.  Because the statutory framework and underlying dispute have not changed since ABI filed its original motion in September of 2000, this background section closely tracks the background section contained in the Court's October 3, 2000 Memorandum Opinion.

sive. *Mova Pharm. Corp. v. Shalala,* 140 F.3d 1060, 1063 (D.C.Cir.1998).

Under the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 301, *et seq.* ("FFDCA"), the holder of an approved NDA (the entity with the right to sell a brand-name drug) must inform the FDA of any patents that could reasonably be asserted to cover the drug in question. This is known as "listing" the patents with the FDA. *See* 21 U.S.C. § 355(b)(1); 21 C.F.R. § 314.53. If a relevant patent is issued after the NDA is approved, the NDA holder has thirty days from the date the patent was issued to "list" the patent. *See* 21 U.S.C. § 355(c)(2); 21 C.F.R. § 314.53(d)(3).

The procedure for obtaining approval of generic drugs is less onerous than that faced by pioneer manufacturers. In 1984, in an effort to facilitate the entry of generic drugs into the market, Congress passed the Hatch–Waxman Amendments to the FFDCA, which significantly revised the generic drug approval process. Instead of preparing an NDA, the generic drug proponent can submit an Abbreviated New Drug Application ("ANDA"). *See* 21 U.S.C. § 355(j). Section 355 sets forth various requirements for the information that must be included in the ANDA. Unlike the pioneer manufacturer, who bears the burden of proving to the FDA that the active ingredient is safe and effective, the generic manufacturer bears the lesser burden of providing enough information to show that its product has the same active ingredient, labeling requirements, dosage form, and other essentials as a drug that has already been approved. *See id.* § 355(j)(2)(i)-(v). In other words, the generic manufacturer is allowed to rely on the safety and effectiveness data submitted in the pioneer's NDA.

To avoid the obvious patent infringement problems inherent in such a statutory scheme, § 355 also contains some protection for the holders of patents related to the approved brand-name drug. In addition to showing that the active ingredient in its drug is the same as the active ingredient in the brand-name drug, the ANDA applicant must also certify to the FDA that the generic version will not interfere with any patents that the NDA holder was required to "list." This can be accomplished by certifying

(I) that such patent information has not been filed,

(II) that such patent has expired,

(III) . . . the date on which such patent will expire, or

(IV) that such patent is invalid or will not be infringed by the manufacture, use, or sale of the new drug for which the application is submitted.

*Id.* § 355(j)(2)(vii). The last of these, the so-called "Paragraph IV" certification, is the only certification at issue in this litigation.

In addition to the requisite certification to the FDA, the Paragraph IV ANDA applicant must also provide notice to the patent holder and to the NDA holder explaining why the generic version does not infringe the patent or why the patent is invalid. *See id.* § 355(j)(2)(B). If the patent holder does not bring a patent infringement action within forty-five days of receipt of that notice, the FDA may approve the ANDA effective immediately. *See id.* § 355(j)(5)(B)(iii). If the patent holder brings suit within forty-five days, the effective date of any FDA approval is delayed, either for thirty months or until the court concludes that the patent is invalid or has not been infringed, whichever is shorter. *See id.*

**B.  *The Factual Scenario of this Case***

In 1992, the FDA approved Bristol–Myers' New Drug Application for the anti-

cancer drug paclitaxel, which Bristol–Myers has subsequently marketed under the brand name Taxol. *See* Compl. ¶ 17. On July 30, 1997, BNP submitted an ANDA for a generic version of the drug. *See* Administrative Record 1 [hereinafter "AR"] (Aug. 28, 2000 FDA letter to BNP). Following that submission, Bristol–Myers listed two patents with the FDA, and BNP certified as to them under Paragraph IV. Bristol–Myers thereupon initiated a patent infringement suit which delayed any FDA approval for thirty months. That thirty-month period ended in June 2000.

On August 1, 2000, ABI received a patent for a novel dosage form of Taxol (" '331 patent"). *See* Mem. of P. & A. in Supp. of Mot. of [ABI] for a T.R.O. or, in the Alternative, for Prelim. Inj. [hereinafter "ABI's First Mot. for TRO/PI"], Ex. 3(A)(b) (printout from U.S. Patent and Trademark Office website). Ten days later, ABI sued Bristol–Myers in federal court in California to compel Bristol–Myers to list the '331 patent. That same day, the California court issued a Temporary Restraining Order ("TRO") directing Bristol–Myers to list the '331 patent "subject to the proviso that, unless [ABI] carries its burden of proof [regarding a preliminary injunction], [Bristol–Myers] shall then take all steps under its control to cause the de-listing" of the '331 patent. *See* AR 2 (enclosure accompanying letter). Bristol–Myers, which had requested the TRO's narrow language and proviso, complied with the requirements the same day, August 11, 2000. *See* BNP's Opp'n to ABI's Original Mot. Ex. 4 at 16–17 (Tr. of Sept. 16, 2000 hearing before Judge Byrne) (describing Bristol–Myers' desire for limitation on scope and requirements of the TRO); AR 3 (BNP's August 11, 2000, submission to the FDA). At that time, only ten of the thirty days allotted for listing had expired.

On August 14, 2000, BNP submitted a Paragraph IV certification in which it acknowledged the recently listed '331 patent, but stated that its ANDA would not result in infringement. *See* AR 1 (Aug 28, 2000 FDA letter to BNP). Two weeks later, the FDA informed BNP that it had completed its substantive review of BNP's ANDA, but that it could not issue final approval until the questions about the '331 patent had been resolved. *See id.*

On September 7, 2000, the California court dismissed the case before it, which included the FFDCA claim and state law claims, under Rule 12(b)(6). In the order announcing the dismissal, the court noted that ABI did not have a private right of action under the FFDCA. Accordingly, the court dissolved the TRO and commanded that "[p]ursuant to the condition in the TRO and in order to restore the status quo, [Bristol–Myers] shall use its best efforts to cause the de-listing of [ABI's] Patent .... ABI shall cooperate with [Bristol–Myers] in its efforts to delist the '331 Patent pursuant to the TRO." AR 5 ¶¶ 1–4 (enclosure accompanying letter). The effective date of the dissolution was stayed until September 13 in order to give the parties an opportunity to appeal. *See id.* ¶ 11.

Also on September 7, 2000, ABI brought a patent infringement suit against BNP in the Central District of California. *See* AR 14 (enclosure accompanying letter). ABI informed the FDA of this litigation by letter dated September 8, 2000, and asserted that the lawsuit barred the FDA from approving BNP's ANDA for thirty months. *See id.*

On September 11, 2000. Bristol–Myers sent another letter to the FDA listing the '331 patent. In that letter, Bristol–Myers did not reference its August 11 listing pursuant to the TRO, and it did not indicate that it believed that the patent

was already listed in some manner. *See* AR 6. According to the FDA, the September 11 letter amounted to a "late listing" of the '331 patent. *See* Buehler Decl. ¶ 16.

On September 14, 2000, after the California court's dismissal order took effect, Bristol–Myers withdrew its August 11 listing of the '331 patent "to the extent that listing was compelled by the TRO." AR 7 at 2 (Sept. 14, 2000 letter from Bristol–Myers to FDA). Bristol–Myers also expressly stated that the withdrawal did "not affect the continued and continuous listing of the patent." *Id.* The FDA interpreted this letter as a complete withdrawal of the August 11 listing. *See* Buehler Decl. ¶ 16.

Also on September 14, BNP amended its Paragraph IV certification by withdrawing its previous acknowledgment of the '331 patent. *See* AR 8 (Sept. 14, 2000 letter from BNP to FDA). BNP took this step because Bristol–Myers "has withdrawn ... the '331 patent listing ..., and BNP is not required to certify any subsequent listing ... that was made more than 30 days after" ABI received the patent. *Id.* The FDA granted final approval for BNP's ANDA on the generic version of paclitaxel on September 15, 2000. *See* AR 10 (FDA letter to BNP).

On September 20, 2000, ABI filed its Complaint in this action, together with its original motion for a temporary restraining order or a preliminary injunction. After thorough briefing and a motions hearing, the Court issued a Memorandum Opinion and Order denying the motion. ABI appealed the decision and, in an opinion issued March 30, 2001, the United States Court of Appeals vacated on proce-

dural grounds. Specifically, the appeals court held "only that the court, before assessing [ABI]'s probability of success on the merits, should have required the FDA to file the administrative record and should have determined the grounds on which the FDA granted [BNP]'s application." *See American Bioscience, Inc. v. Thompson,* 243 F.3d 579, 582 (D.C.Cir.2001).

Following the issuance of the appeals court's order, the FDA filed the administrative record and, on April 10, 2001, ABI filed its renewed motion for preliminary injunctive relief.[4] In the renewed motion, ABI requests that the Court grant injunctive relief prior to April 20, 2001, the date on which generic manufacturers other than BNP will be able to enter the market with FDA approval. Upon consideration of that motion, opposition memoranda filed by the FDA and BNP, ABI's reply, the administrative record, and the applicable law, the Court shall deny the motion.

## II. ANALYSIS

In assessing whether to grant preliminary injunctive relief, which is considered an extraordinary remedy in this circuit, *see Dorfmann v. Boozer,* 414 F.2d 1168, 1173 (D.C.Cir.1969); *Mylan Pharm. Inc. v. Henney,* 94 F.Supp.2d 36, 58 (D.D.C.2000), a court must balance four factors: (1) whether the litigant is substantially likely to succeed on the merits; (2) whether the litigant would suffer irreparable injury if the injunction is not granted; (3) whether an injunction would substantially injure other interested parties; and (4) whether the public interest would be furthered by

---

4. In its renewed motion, ABI repeatedly supports substantive arguments with selective quotations from the oral argument before the United States Court of Appeals for the District of Columbia Circuit. This Court shall disregard that support because it is unpersuasive and inappropriate. The statements of individ-ual judges on the court of appeals are not binding authority. On the contrary, only the appeals court's written opinion binds a trial court and impacts the subsequent treatment of a case. In this instance, the holding at the core of the appeals court's opinion was narrowly framed and unmistakably procedural.

the injunction. *See Mova Pharm.*, 140 F.3d at 1066 (citing *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C.Cir.1995)).

In applying this four-factored standard, district courts employ a sliding scale under which a particularly strong showing in one area can compensate for weakness in another. *See CityFed Fin.*, 58 F.3d at 747. Thus, "[a]n injunction may be justified, for example, where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury." *Id.* In its application of the standard in this case, the Court turns first to the requirement that ABI demonstrate irreparable harm. While the analysis of that factor alone convinces the Court that injunctive relief is not warranted, the Court subsequently addresses ABI's likelihood of success on the merits, the possibility of substantial injury to other interested parties, and the impact that an injunction would have on the public interest.

### A. Irreparable Injury

█ Notwithstanding the sliding scale that applies to the traditional four-part analysis, a party seeking preliminary injunctive relief must demonstrate at least some irreparable injury because "the basis for injunctive relief in the federal courts has always been irreparable harm." *Id.* (quoting *Sampson v. Murray*, 415 U.S. 61, 88, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974)) (alterations omitted). That is, if the movant makes no showing of irreparable injury, "that alone is sufficient" for a district court to refuse to grant preliminary injunctive relief. *Id.; see also Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C.Cir.1985) ("We believe that analysis of [irreparable harm] disposes of these motions and, therefore, address only

whether the petitioners have demonstrated that in the absence of a stay, they will suffer irreparable harm.").

According to the D.C. Circuit, injury is irreparable only if it is "both certain and great." *Wisconsin Gas*, 758 F.2d at 674. This two-part definition requires first that the alleged harm "be actual and not theoretical" and " 'of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm.' " *Id.* (quoting *Ashland Oil, Inc. v. FTC*, 409 F.Supp. 297, 307 (D.D.C.), *aff'd*, 548 F.2d 977 (D.C.Cir.1976)) (emphasis in original). Second, financial harm alone cannot constitute irreparable injury unless it threatens the very existence of the movant's business. *See Wisconsin Gas*, 758 F.2d at 674 (citing *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 n. 2 (D.C.Cir.1977)). As the D.C. Circuit has explained,

> The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation weighs heavily against a claim of irreparable harm.

*Wisconsin Gas*, 758 F.2d at 674 (quoting *Virginia Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (1958)).

After carefully assessing ABI's allegations, the Court concludes that the anticipated injury is neither certain nor great. Notably, in its meager effort to articulate its irreparable injury, ABI primarily refers the Court to the descriptions that accompanied its original motion filed nearly six months ago. *See* ABI's Renewed Mot. at

22.[5] In the original motion, ABI ventured that the FDA's approval of BNP's generic product would "severely impair" ABI's capacity "to maximize the value of the '331 patent" and would harm the prospects for potential licensing arrangements. ABI's First Mot. for TRO/PI at 22. ABI sought to illuminate these vague allegations of harm through two separate declarations of its Chief Executive Officer, Dr. Patrick Soon–Shiong.

In his first declaration, Dr. Soon–Shiong described a few *potential* business opportunities that depend on injunctive relief. *See* ABI's First Mot. for TRO/PI, Ex. 4 ¶¶ 8–9 (Sept. 19, 2000 Decl. of Dr. Soon–Shiong). Further, without providing any detail, he stated that allowing the FDA to grant final approval of BNP's ANDA "is materially impairing, and will continue to materially impair, ABI's ability to attract new financing sources." *Id.* ¶ 10. In his supplemental declaration, Dr. Soon–Shiong made draconian predictions about what

"*could*" ensue without injunctive relief, and he averred that "*perhaps* the very existence of the company *may* be placed in jeopardy." ABI's Reply [in Supp. of ABI's First Mot. for TRO/PI], Ex. A ¶ 6 (Sept. 25, 2000 Decl. of Dr. Soon–Shiong) (emphasis added); *see also id.* ¶¶ 7–8. Notwithstanding the claim that ABI would be unable to attract "tens of millions of dollars" of financing, the supplemental declaration contained little more detail than the first. *Id.*

The harms that ABI described in its original motion are neither "certain" nor "great." ABI warned of looming, devastating injuries in a conclusory and conjectural fashion that was almost entirely devoid of necessary detail. Notably, ABI speculated about an ensuing corporate collapse, yet failed to support its fears with any precise information on, among other things, (1) its income or financing, (2) the degree to which an unfavorable decision

---

5. Relying on district court decisions issued more than twenty years ago, ABI argues that it need not demonstrate any irreparable injury because such equitable considerations are irrelevant when a federal agency has violated a statute. *See* ABI's Renewed Mot. at 20. As the most recent of those cases demonstrates, however, allegations of statutory violation do not automatically and completely transform the nature of the analysis. On the contrary, a movant must demonstrate "a *clear and substantial* violation of a statute," and even then the need to balance the other factors is only "lessen[ed]," not eliminated. *Nat'l Wildlife Fed. v. Andrus*, 440 F.Supp. 1245, 1256 (1977) (emphasis added) (applying the traditional four factors notwithstanding the federal agency's statutory violation). That is, even if ABI were able to convincingly demonstrate a statutory violation, the Court's analysis would simply focus less on factors other than the merits of the statutory violation. The Court's analysis would not, however, ignore the other factors altogether. Because the Court finds that ABI has failed to demonstrate irreparable injury *at all*, and because irreparable injury is the touchstone of injunctive relief, *see CityFed*

*Fin.*, 58 F.3d at 747, ABI would not be entitled to a temporary restraining order or preliminary injunction even if the reduced standard were to apply.

Moreover, the D.C. Circuit appears to endorse an approach contrary to that espoused by ABI. In *Mova Pharmaceutical*, the plaintiff drug manufacturer sought injunctive relief, arguing that the FDA violated the statutory provision under which the first generic manufacturer enjoys a six-month period of market exclusivity. *See Mova Pharm.*, at 1062–63. After the district court granted the injunction based on an analysis of *each* of the four factors, *see id.* at 1066, the Court of Appeals affirmed. *See id.* at 1074. Notably, notwithstanding the statutory violation at the center of the litigation, the appellate court set forth the traditional four-part standard and omitted any reference to the reduced standard that ABI champions in its motion. *See id.* at 1066.

Finally, while ABI's failure to show irreparable injury is dispositive in and of itself, the Court explains below that ABI's argument is beside the point because the FDA has not violated a statute or a regulation.

(and resulting generic paclitaxel sales) would impact those figures, or (3) how that impact would translate into corporate devastation. Without such detail, and without an indication that these feared injuries amount to more than mere hypothesis, the Court cannot conclude that ABI faces "irreparable harm."

While these allegations of harm were excessively vague when ABI first presented them last September, that failing is even more acute now. When ABI first described the anticipated harms, it was attempting to assess the injury that would befall it, in the future, after BNP's product hit the market. Under the present circumstances, however, that injury no longer looms in the future. Because this Court denied ABI's original motion, BNP began marketing its competitive generic product in October 2000. *See* ABI's Renewed Mot. at 2. Thus, the harms that were merely prospective at the time of the original motion should have crystallized into actual, articulable injury as soon as BNP began selling.

Because the alleged harm has already befallen it, ABI should be in a position to articulate the injury with great precision and to describe the features that make it irreparable. Not only does ABI fail to provide any such description, it takes the curious step of relying on descriptions that were prepared before the alleged harm occurred. This litigation tactic, by which ABI avoids any reference to or description of the actual scope of the injury, lacks the detail necessary to show that the injury is "certain and great." To the contrary, ABI's complete failure to describe the extent of its actual harm indicates that it is not nearly as overwhelming as ABI might like the Court to believe.

Moreover, the injuries about which ABI speculates fall far short of the "irreparable" standard because they are purely economic in nature. *See* ABI's Renewed Mot. at 22 (describing injuries as "serious financial harm"). In apparent acknowledgment of this flaw, ABI takes pains to argue that it has no adequate remedy for such harms because the FDA is immune from suit for money damages. *See id.* at 21. While ABI is correct that economic harm *may* qualify as irreparable if the monetary loss is not recoverable, *see Wisconsin Gas,* 758 F.2d at 674 (citing *Holiday Tours,* 559 F.2d at 843 n. 2), ABI has failed to convincingly argue that it lacks a route to such recovery here.

In its ruling on ABI's original motion, this Court observed that ABI could mitigate its losses through patent litigation against alleged infringers like BNP. *See* Oct. 3, 2000 Mem. Op. at 26. The FDA and BNP make similar points in their oppositions to ABI's renewed motion. *See* [FDA]'s Mem. in Opp'n to [ABI's Renewed Mot.] at 19; Mem. of [BNP] in Opp'n to [ABI's Renewed Mot.] at 10. Quite plainly, entities like BNP are not sheltered by the sovereign immunity that might protect the FDA from suit. Thus, not only is the availability of patent litigation pivotal to the assessment of irreparable harm, it is an issue raised by the Court and by both of the parties that oppose the renewed motion. Curiously, notwithstanding the centrality of such routes to recovery, ABI refers to them only fleetingly, contending that the FDA is immune and that suits for damages against infringers would not provide full compensation for its losses. *See* Renewed Mot. at 21. ABI's counterargument with respect to the FDA simply misses the point; regardless of the federal agency's immunity, ABI can use patent law to seek relief from alleged infringers like BNP. Furthermore, ABI's argument pertaining to the inadequacy of monetary damages in patent actions evinces a misunderstanding of the remedies available in

such suits. Precisely because monetary relief may provide insufficient compensation, patent law also "provides injunctive relief to preserve the legal interests of the parties." *Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446, 1457 (Fed.Cir.1988). Thus, if BNP is indeed infringing on ABI's patent, the patent law provides ABI with a route to monetary recovery and to injunctive relief as well.

In its renewed motion, ABI also argues, very briefly, that it will suffer additional harm on or about April 20, 2001. *See* ABI's Renewed Mot. at 22. ABI asserts that BNP's six-month period of generic market exclusivity expires near that date, at which time other generic manufacturers will enter the fray, thereby "further depriv[ing] ABI of its Hatch–Waxman Act patent rights." *Id.* at 2. While ABI asserts that the end of BNP's period of exclusivity will hurt, it provides no tangible indication of how. This utter lack of precision prevents it from constituting irreparable injury. ABI offers absolutely no information describing the scope of this expected harm, how it will affect ABI's financial position, the precise impact it will have on the company's competitive position, and whether it will threaten ABI's existence altogether. Only through such precise descriptions can the Court assess the irreparability of an injury. Without such information, the Court can only conclude that the allegations amount to vague and unsubstantiated speculation. Quite simply, such speculation cannot support a finding that the injury is "both certain and great." *Wisconsin Gas*, 758 F.2d at 674.

In short, the Court finds that ABI has failed to demonstrate any irreparable harm at all. Critically, ABI relies on allegations that it made before BNP's generic product hit the market. Notwithstanding the facial insufficiency of those allegations, ABI fails to supplement them with any precise information relating to the harm it has actually suffered since BNP's entry into the market in October 2000. Moreover, while ABI contends that it will suffer additionally when BNP's period of market exclusivity ends, it completely fails to articulate how. These allegations do not simply amount to a weak showing of irreparable injury; rather, they fail to demonstrate irreparable injury at all.

Because the Court cannot issue a preliminary injunction absent at least some showing of irreparable injury, *see CityFed Fin.*, 58 F.3d at 747, ABI's motion fails on this ground alone. In the interest of completeness, however, the Court also addresses the other factors.

## B. Success on the Merits

### 1. Administrative Record

As noted, the D.C. Circuit vacated this Court's earlier decision because the applicable administrative record had never been submitted. *See American Bioscience*, 243 F.3d at 582. Specifically, the appeals court held that in Administrative Procedure Act cases such as this one, the Court's "review must 'be based on the full administrative record that was before the [FDA] at the time [it] made its decision.' " *Id.* (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)) (alterations in *American Bioscience* ). Essentially, this litigation pertains to two agency "decisions": (1) whether the FDA concluded that Bristol–Myers had timely listed the ABI patent, and (2) whether BNP's ANDA was protected by the FDA's late-listing regulation. *See American Bioscience*, 243 F.3d at 581.

Following the issuance of the appeals court's decision, the FDA submitted an administrative record containing all the documents that were before the agency at

the time of its decision. *See* Administrative Record [hereinafter "AR"]. There is no indication from either party that leads the Court to believe that the record is anything other than complete. Notwithstanding its completeness, however, the record includes no overt reference to the decisions at issue. There are parts of the record, however, that implicitly support the FDA's version of events, i.e., that the agency determined that Bristol–Myers' letter of September 14 withdrew its listing of the '331 patent and submitted a voluntary listing only after the deadline had expired. For instance, in the September 15, 2000 letter informing BNP of the approval of generic paclitaxel, the FDA confirmed that BNP had met all the requirements, procedural and technical, for selling the generic drug. *See* AR 10 at 1. Because earlier correspondence from the FDA clearly establish that it was aware of the '331 patent, *see, e.g.*, AR 1 (Aug. 28, 2000 Letter from FDA to BNP) the September 15, 2000 letter implies that the FDA believed the patent had been withdrawn. Additionally, while the September 15 letter itself contains no direct reference to the '331 patent or its withdrawal, it does refer to previous submissions from BNP relating solely to the patent and BNP's position that the listing had been withdrawn. *See* AR 10 at 1 (referring to letters dated September 8, 2000 (AR 9) and September 14, 2000 (AR 8)). In other words, the record demonstrates that the '331 patent was clearly in the decisionmaker's mind at the time of his decision; in light of his ultimate decision to approve the ANDA, the record implies that the decisionmaker determined that

Bristol–Myers did not timely list the patent.

The record also impliedly supports the FDA's position by effectively refuting one of ABI's principal theories. ABI contends that Bristol–Myers' original listing has been effective since August 11, 2000, the date on which it delivered a listing letter to the FDA pursuant to the California court's TRO. *See* ABI's Renewed Mot. at 11. Notwithstanding Bristol–Myers' subsequent withdrawal of that listing "to the extent [it] was compelled by the TRO," *see* AR 7, ABI argues that the listing has been continuous because it was originally made both pursuant to the TRO *and* voluntarily. *See* ABI's Renewed Mot. at 11. That is, even though it withdrew the court-ordered aspect of the listing, ABI argues that Bristol–Myers' listing of the '331 patent is still effective because it had a voluntary element, too.

The record refutes this reasoning rather directly. After the California court ordered Bristol–Myers to list the patent in compliance with 21 C.F.R. § 314.53, *see* AR 2 (enclosure following letter), Bristol–Myers sent a letter to the FDA by which it listed the patent "pursuant to" the California TRO "in accordance with the provisions of 21 C.F.R. § 314.53." *See* AR 3 (Bristol–Myers' August 11, 2000 letter to FDA). In other words, nothing about Bristol–Myers' listing appears voluntary at all. It only submitted its listing letter after a court ordered it to do so, and it limited the scope of the letter so as to synchronize it precisely with the court's order.[6] Notably, had Bristol–Myers listed voluntarily, as ABI now asserts it did,

---

6. ABI disingenuously contends that the inclusion of the phrase "in accordance with the provisions of 21 C.F.R. § 314.53" indicates that Bristol–Myers listed the patent pursuant to the court order *and* voluntarily in accordance with the regulation. *See* ABI's Renewed Mot. at 11. As noted, the California

court expressly ordered Bristol–Myers to comply with the regulation. *See* AR 2. at 2. Thus, while the August 11, 2000 listing letter refers to the regulation, that merely demonstrates conformance with the court order, not a separate and voluntary basis for listing.

there would have been no need for a court order, and Bristol–Myers' listing letter would not have conformed so precisely to the parameters of the order. Moreover, if Bristol–Myers viewed its August 11 listing as voluntary and independently valid, it would not have submitted another letter on September 11 seeking to list again.

Still, notwithstanding the inferences that can be drawn from the administrative record, nothing within it explains the agency's decisionmaking clearly enough to allow this Court to engage in review under the APA. In *Overton Park, Inc. v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), the Supreme Court considered a comparably unilluminating administrative record and concluded that "it may be necessary for the District Court to require some explanation in order to determine if the Secretary acted within the scope of his authority and if the Secretary's action was justifiable under the applicable standard." *Id.* at 420, 91 S.Ct. 814. One way of obtaining such an explanation is to "require the administrative officials who participated in the decision to give testimony explaining their action." *Id.* While noting that such an "inquiry into the mental pro-

cesses of administrative decisionmakers is usually to be avoided," *id.*, the Court expressly condoned such an approach in situations where, as here, there are no formal administrative findings or other materials in the record from which a court could conduct effective judicial review. *See id.; see also Camp v. Pitts*, 411 U.S. 138, 142–43, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973) ("If ... there was such failure to explain administrative action as to frustrate effective judicial review, the remedy was not to hold a *de novo* hearing but, as contemplated by *Overton Park*, to obtain from the agency, either through affidavits or testimony, such additional explanation of the reasons for the agency decision as may prove necessary.").[7]

In this case, the FDA has provided the Court with the sworn testimony of Gary J. Buehler, the acting director of the FDA office "responsible for reviewing and approving [ANDAs] for generic drugs." *See* Buehler Decl. ¶¶ 1–2. In his declaration, Mr. Buehler fills in the material gaps in the administrative record, thereby providing precisely the type of explanation envisioned in *Overton Park*.[8] Specifically, Mr.

---

7. The Supreme Court held that a court may, in some instances, require the agency to supplement the administrative record with formal findings rather than with a decisionmaker's testimony. *See Overton Park*, 401 U.S. at 417, 420–21, 91 S.Ct. 814. In deciding whether to rely on testimony or supplemental findings, district courts should "consider which method will prove the most expeditious so that full review may be had as soon as possible." *Id.* at 421, 91 S.Ct. 814. In this case, in light of the current availability of the sworn declaration of the appropriate FDA decisionmaker, the court finds that reliance on such testimony would be far more expeditious.

8. In its renewed motion, ABI dismisses Mr. Buehler's declaration as "nothing more than the *post hoc* rationalization barred by the *Overton Park* case." ABI's Renewed Mot. at 5. While the declaration is undeniably *post*

*hoc*, ABI's conclusion that it is therefore improper is misguided. As held in both *Overton Park* and *Camp*, district courts must require agencies to prepare supplemental information, either through testimony or findings of fact, when the administrative record does not adequately illuminate the matter at issue. *See Overton Park*, 401 U.S. at 420, 91 S.Ct. 814; *Camp*, 411 U.S. at 142–43, 93 S.Ct. 1241. Such supplemental submissions are *post hoc* virtually by definition because it is only after an initial review of the record that a court can determine whether more explanation is needed. In fact, the *Camp* Court considered precisely such a situation and determined that, when the administrative record before the district court is insufficient, the court must remand for "additional explanation." *Camp*, 411 U.S. at 143, 93 S.Ct. 1241. Because that additional explanation is prepared solely for the use of the court, and not contemporane-

Buehler explains that, after Bristol–Myers withdrew its initial listing "to the extent [it] was compelled by the TRO," *see* AR 7, the "FDA considered [Bristol–Myers]'s first submission of the patent on August 11, 2000, to be without effect." Buehler Decl. ¶ 16. Additionally, he states that the FDA viewed Bristol–Myers' September 11, 2000 letter as a late listing. *See id.* Therefore, applying its late-listing regulation, the FDA concluded that BNP was not required to certify with respect to the '331 patent prior to the approval of its pending ANDA. *See id.*

Thus, taken together with the full administrative record, Mr. Buehler's declaration establishes the FDA's decision-making process with regard to the two of the decisions central to this litigation: (1) the FDA's determination that Bristol–Myers did not submit a timely listing with respect to the '331 patent, and (2) the FDA's conclusion that BNP's ANDA was protected by the agency's late-listing regulation. With this record and supplemental declaration in place, the Court revisits its earlier reasoning regarding ABI's likelihood of success on the merits.

### 2. Consideration of the Merits

In order to demonstrate a substantial likelihood of success, ABI must show that the FDA's interpretation of the statute is arbitrary, capricious, not in accordance with the law, or unwarranted by the facts. *See* 5 U.S.C. § 706(2). To do so, ABI may illustrate the adoption of improper regulations or highlight the faulty application of statutory directives.

In order to determine whether the FDA's interpretation of the statute is valid, the Court must ask whether "Congress has directly spoken to the precise question

at issue;" if so, "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron U.S.A. Inc. v. Nat'l Res. Def. Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *Mova,* 140 F.3d at 1067. If, however, "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron,* 467 U.S. at 842–43, 104 S.Ct. 2778; *Mova,* 140 F.3d at 1067. So long as the agency's interpretation is "reasonable and consistent with the statute's purpose," the Court must defer to the agency's interpretation. *See Chemical Mfrs. Ass'n v. EPA,* 217 F.3d 861, 866 (D.C.Cir.2000) (quoting *Independent Ins. Agents of Am., Inc. v. Hawke,* 211 F.3d 638, 643 (D.C.Cir. 2000)).

### a. Bristol–Myers Did Not List the '331 Patent Within 30 Days of Issuance

■ As Mr. Buehler's declaration makes clear, the FDA determined that Bristol–Myers did not list with respect to the '331 patent within thirty days of the patent's issuance, as required by 21 U.S.C. § 355(c)(2). *See* Buehler Decl. ¶ 16. In brief, ABI's likelihood of success on the merits depends on whether it will be able to show that the FDA's determination was contrary to the plain meaning of the statute, or, in the alternative, that the statutory language is ambiguous and the FDA's interpretation is not based on a "permissible construction" of the statute. Under the statute in question, the holder of an approved NDA

shall file with the Secretary the patent number and the expiration date of any

---

ously with the development of the administrative record, it is unquestionably *post hoc,* yet

nonetheless permissible.

patent which claims the drug for which the application was submitted or which claims a method of using such drug and with respect to which a claim of patent infringement could reasonably be asserted ... not later than thirty days after the date the patent is issued.

21 U.S.C. § 355(c)(2).

It is undisputed that the '331 patent was issued on August 1, 2000. ABI asserts that Bristol–Myers complied with the thirty-day window of section 355(c)(2) by listing the '331 patent on August 11, 2000. In the letter by which it made that alleged listing, Bristol–Myers informed the FDA that it was submitting the patent information "[p]ursuant to an order of the United States District Court for the Central District of California." *See* AR 3. As explained above, Bristol–Myers did not indicate that it was submitting the patent information for any other reason.

The court order to which Bristol–Myers referred was the TRO issued by the district court in California on August 11, 2000. *See* AR 2 (enclosure following letter). In that order, Judge Rea instructed Bristol–Myers to list the '331 patent "subject to the proviso that, unless [ABI] carries its burden of proof on the [Order to Show Cause], [Bristol–Myers] shall then take all steps under its control to cause the de-listing" of the '331 patent. *Id.* at 2. Bristol–Myers has acknowledged that it specifically requested that Judge Rea include that proviso. *See* BNP's Opp'n to ABI's Original Mot. Ex. 4 at 16–17 (Tr. of Sept. 16, 2000 hearing before Judge

Byrne). In other words, Judge Rea accepted Bristol–Myers' proposed language and ordered Bristol–Myers to submit its temporary listing pursuant to the TRO, pending resolution of the motion for a preliminary injunction. As Bristol–Myers indicated in its August 11 submission letter to the FDA, it listed the '331 patent information only pursuant to the limited TRO that it had helped to craft. *See* AR 3.

On September 7, 2000, the California district court that had issued the TRO determined that ABI did not have a private right of action upon which to make an FFDCA claim. *See* AR 5 (enclosure following letter), ¶ 1. Accordingly, the court dissolved its August 11, 2000, temporary restraining order, ordered Bristol–Myers to "use its best efforts to cause the de-listing of plaintiff's '331 Patent," and dismissed the case. *Id.* ¶ 4.

Notably, the California district court originally issued its TRO with a very narrow result in mind: Bristol–Myers was to submit a provisional, temporary listing subject to complete delisting pending the results of its Order to Show Cause on the Preliminary Injunction. *See* AR 2. Solely in order to comply with that narrow order, Bristol–Myers submitted the relevant patent information to the FDA on August 11, 2000. *See* AR 3. When the California court subsequently dissolved the TRO and ordered de-listing, Bristol–Myers complied again, and de-listed the patent "to the extent that listing was compelled by the TRO." *See* AR 7 (Sept. 14, 2000 letter from Bristol–Myers to FDA).[9]

---

9. While Bristol–Myers' patent may have been continuously listed in the FDA's "Approved Drug Products with Therapeutic Equivalence Evaluations" (the "Orange Book") since August 11, 2000, that observation alone does not establish that the FDA considers the patent to have been listed in a timely fashion.

On the contrary, as Mr. Buehler explains in his declaration, the Orange Book's uninterrupted inclusion of the patent reflects the original August 11 listing, which was subsequently withdrawn, and Bristol–Myers's late-listing, which was submitted on September 11, 2000. *See* Buehler Decl. ¶¶ 10–17. In short, while the FDA initially included

Because Bristol–Myers' August 11 listing was prompted solely by the TRO, and because Bristol–Myers' September 14 letter withdraws that listing to the extent it was compelled by the TRO, there is not a substantial likelihood that ABI will be able to demonstrate that the FDA acted arbitrarily or capriciously in concluding that Bristol–Myers withdrew its August 11 listing altogether. Moreover, since Bristol–Myers had submitted nothing else to the FDA regarding the '331 patent before the August 31 deadline, there is not a substantial likelihood that ABI will be able to demonstrate that the FDA acted arbitrarily or capriciously in concluding that Bristol–Myers failed to list within the statutory thirty-day filing period. Further, the Court finds that ABI is not substantially likely to succeed with its argument that Bristol–Myers' August 11 listing qualifies on its own as a listing within the thirty-day period. Bristol–Myers precisely limited the scope of its August 11 submission to that required by the TRO; accordingly, Bristol–Myers and ABI are estopped from asserting that the submission had any lasting purpose independent from compliance with the limited TRO.

In sum, notwithstanding this drug's unorthodox treatment at the hands of its competing manufacturers and the FDA, the Court is unable to conclude that ABI is substantially likely to succeed on the merits of its claim that the FDA acted arbitrarily or capriciously in refusing to treat Bristol–Myers' listing as timely.

### b. The Late–Listing Regulation Protected BNP From Having to Certify As To The Late–Listed Patent

■ In his declaration, Mr. Buehler testifies that the FDA viewed Bristol–Myers' September 11, 2000 letter as a listing submitted after the statute's thirty-day deadline had expired. *See* Buchler Decl. ¶ 16. Because Bristol–Myers submitted that listing after the thirty-day period, the FDA determined that BNP was protected by the FDA's "late listing" regulation. *See id.;* 21 C.F.R. 314.94(a)(12)(vi).[10]

ABI challenges this reasoning, arguing that it amounts to arbitrary, capricious, and unlawful conduct in violation of the FFDCA and the agency's own regulations. *See* ABI's Renewed Mot. at 14–18. ABI explains its argument by noting that the regulation would only protect BNP if BNP

---

the '331 patent in the Orange Book based on Bristol–Myers' August 11 letter, the FDA concluded that Bristol–Myers' September 14 letter withdrew the August 11 listing altogether. *See id.* ¶¶ 10, 16. While that conclusion might normally require removing the listing from the Orange Book, the '331 patent remains in the Orange Book because Bristol–Myers listed the patent separately, albeit tardily, on September 11. *See id.* ¶¶ 13, 16–17. Thus, it is no surprise that the patent has been listed continuously. Even though FDA believes that the August 11 listing was withdrawn on September 14, the patent was listed separately (and belatedly) on September 11.

10. The "late listing" regulation provides as follows:

> If a patent on the listed drug is issued and the holder of the approved application for

the listed drug does not submit the required information on the patent within 30 days of issuance of the patent, an applicant who submitted an abbreviated new drug application for that drug that contained an appropriate patent certification before the submission of the patent information is not required to submit an amended certification. An applicant whose abbreviated new drug application is submitted after a late submission of patent information, or whose pending abbreviated application was previously submitted but did not contain an appropriate patent certification at the time of the patent submission, shall submit a certification under paragraph (a)(12)(i) of this section or a statement under paragraph (a)(12)(iii) of this section as to that patent.

21 C.F.R. § 314.94(a)(12)(vi).

had already filed "an appropriate patent certification" at the time that Bristol–Myers belatedly listed the '331 patent. *See id.* at 15 (quoting 21 C.F.R. 314.94(a)(12)(vi)). ABI then argues that BNP's Paragraph IV certification was not "appropriate" because BNP had not notified ABI of the certification, as required by the statute and the regulation. *See id.* at 17; 21 U.S.C. § 355(j)(2)(B)(iii); 21 C.F.R. § 314.95(d). Since the certification was not appropriate, ABI argues, the regulation does not protect BNP from the requirement that it re-certify so as to reflect the late-listed '331 patent. *See* ABI's Renewed Mot. at 17. Accordingly, ABI concludes that the FDA acted in contravention of its regulation when it determined that BNP was protected. *See id.*

This Court is required to "give substantial deference to an agency's interpretation of its own regulations." *Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994) (citing *Martin v. Occupational Safety and Health Review Comm'n,* 499 U.S. 144, 150–51, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991)). In such cases, "[t]he agency's construction of its own regulations is controlling 'unless it is plainly erroneous or inconsistent with the regulation.'" *Wyoming Outdoor Council v. U.S. Forest Service,* 165 F.3d 43, 52 (D.C.Cir.1999) (quoting *National Med. Enter. v. Shalala,* 43 F.3d 691, 697 (D.C.Cir.1995)). In other words, "[s]o long as an agency's interpretation of ambiguous regulatory language is reasonable, it should be given effect." *Wyoming Outdoor Council,* 165 F.3d at 52 (citing *Martin,* 499 U.S. at 150, 111 S.Ct. 1171). This extensive deference is particularly warranted when "the regulation concerns 'a complex and highly technical regulatory program,' in which the identification and classification of relevant 'criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns.'" *Thomas Jefferson Univ.,* 512 U.S. at 512, 114 S.Ct. 2381 (quoting *Pauley v. BethEnergy Mines, Inc.,* 501 U.S. 680, 697, 111 S.Ct. 2524, 115 L.Ed.2d 604 (1991)).

The "late listing" regulation at issue in this case concerns a regulatory program covering the high-stakes interplay between patent-holders, brand-name drug manufacturers, and applicants seeking permission to market drugs generically. Unquestionably, this regulatory program is "complex and highly technical." *Thomas Jefferson Univ.,* 512 U.S. at 512, 114 S.Ct. 2381. Furthermore, in light of the competing market and social interests related to the development of new medications and the marketing of generic equivalents, it "entail[s] the exercise of judgment grounded in policy concerns." *Id.* Accordingly, the Court determines that the FDA's application of its "late listing" regulation warrants extensive deference.

In light of that broad deference, the Court cannot conclude ABI is substantially likely to prevail on its claim that the FDA acted erroneously or inconsistently with the late-listing regulation in determining that it applies in this circumstance. The Court reaches this determination because ABI's argument to the contrary depends entirely on a narrow and somewhat ill-fitting definition of "appropriate." ABI argues that BNP's certification was not "appropriate" because it lacked the notification that Paragraph IV requires.[11]

---

11. While ABI strives to make hay of BNP's failure to provide the notification pursuant to the FFDCA and the late-listing regulation, the Court observes that delayed notice *hinders* an ANDA applicant (like BNP) and *benefits* patent holders (like ABI). This is so because a patent holder's right to initiate a patent infringement suit, and benefit from the resulting period of market exclusivity, is triggered by the notice. *See* 21 U.S.C. § 355(j)(2) and

More logically, however, the word "appropriate" refers not to whether an ANDA applicant has provided notice of a Paragraph IV certification, but rather whether the applicant has selected the proper Paragraph under which to certify.

While neither the administrative record nor Mr. Buehler's declaration provide clear insight into the FDA's interpretation of the word "appropriate," the declaration implies that the FDA employed the version just suggested. The Court reaches this conclusion because Mr. Buehler's declaration unequivocally indicates that the FDA determined that the late-listing regulation applied. *See* Buehler Decl. ¶ 16. Since the regulation would only have been applicable had BNP appropriately certified, *see* 21 C.F.R. § 314.94(a)(12)(vi), the FDA must have concluded that BNP had done so. Thus, notwithstanding ABI's suggestion of an alternate definition of "appropriate," the Court finds that ABI is not substantially likely to successfully demonstrate that the FDA acted contrary to its own regulations in determining that the "late listing" regulation protects BNP from required re-certification.

## C. Balancing the Harms and the Public Interest

■ In addition to considering ABI's likelihood of success on the merits and whether it would suffer irreparable harm without injunctive relief, the Court assesses whether an injunction would substantially injure other interested parties [12] and whether the public interest would be furthered by the injunction. *See Mova Pharm. Corp*, 140 F.3d at 1066. In light of the fact that ABI has failed to demonstrate any irreparable injury and is unlikely to succeed on the merits, only a brief mention of these remaining two factors is necessary. In its renewed motion, ABI fails to present any considerations that differ from those presented to the Court at the time of ABI's original motion. *Compare* ABI's Renewed Mot. at 22–23 *with* ABI's First Mot. for TRO/PI at 22–24. Accordingly, the Court largely adopts its reasoning from its earlier decision.

Preliminarily, the Court concludes that preliminary injunctive relief would substantially harm BNP. Requiring BNP to recall its product from the market would force BNP to irretrievably forego valuable sales of its generic version of paclitaxel. Additionally, many cancer patients may have started using the generic version of paclitaxel since BNP entered the market; granting injunctive relief may require such patients to change medications mid-treatment. Moreover, unlike ABI, BNP would

---

(j)(5). So, if an ANDA applicant provides notice belatedly, it effectively postpones the date by which the NDA holder must bring suit, and thereby extends the date on which the thirty-month exclusivity period begins. *See id.* Thus, an ANDA applicant's failure to provide timely notice may deleteriously serve to extend the period during which the applicant is barred from the market.

In this case, it appears that the FDA may never have had occasion to prompt BNP to provide the requisite notification. At the time BNP submitted its certification amendment, *see* AR 8, the FDA had determined that Bristol–Myers' original listing had been withdrawn and that a separate late-listing had been submitted. *See* Buehler Decl. ¶¶ 15–16. Accordingly, because FDA understood that there had been no timely listing of the '331 patent, BNP was not required to provide notice under the late-listing regulation. *See* 21 C.F.R. § 314.94(a)(12)(vi).

12. Apparently, all interested parties are now parties to this litigation: Plaintiff ABI holds the '331 patent; Intervenor Bristol–Myers holds the NDA for paclitaxel/Taxol; Intervenor BNP has submitted an ANDA that covers paclitaxel; and Defendant FDA is charged with the duty of administering the statutory and regulatory scheme that governs the interaction among the other parties' patent and application interests.

 

not have an alternative remedy following an unfavorable ruling to recoup any financial losses. Additionally, ABI's arguments to the contrary notwithstanding, this Court has determined that the FDA most likely acted lawfully in approving BNP's ANDA. Thus, there is no substance to ABI's argument that any harm BNP suffers is the proper result of the operation of law.

▪ The Court also concludes that the public interest stands in equipoise. In passing the Hatch–Waxman Amendments, Congress carefully balanced the competing public interests in increased access to generic drugs and in expanded development of expensive, and valuable, medications. See H.R.Rep. No. 98–857, pt. 1. In large part, the interests at stake in this litigation reflect precisely the public interests that Congress sought to balance. Granting injunctive relief would advance the public interest in the development of new drugs, while at the same time harming the public interest in increased access to affordable medication. Denying the motion would produce an inverted result. Thus, whatever the Court decides, the public interest will be both furthered and hampered.

In sum, the Court concludes that the third factor weighs against granting a temporary restraining order or a preliminary injunction and that the fourth stands in equipoise. Injunctive relief would cause substantial harm to BNP, and its aggregate impact on the public interest would essentially be neutral.

### III. CONCLUSION

For the foregoing reasons, the Court concludes that ABI has failed to demonstrate that it will suffer any irreparable injury without a grant of preliminary injunctive relief. While this determination alone requires the Court to deny ABI's motion, the Court also finds that ABI is not substantially likely to succeed on the merits and that an injunction would substantially injure another interested party. Accordingly, the Court shall deny ABI's Renewed Motion for a Temporary Restraining Order or Preliminary Injunction. An Order accompanies this Memorandum Opinion.